DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a decision of the Lucas County Court of Common Pleas, Juvenile Division, that awarded permanent custody of Andrew S. and Emily S. to appellee Lucas County Children Services ("LCCS"). For the following reasons, the judgment of the trial court is affirmed. *Page 2 
 {¶ 2} Appellant Phyllis F., mother of Andrew and Emily S., sets forth the following assignment of error:
 {¶ 3} "The trial court's finding that the children could not nor should not be placed with appellant within a reasonable time was not supported by clear and convincing evidence."
 {¶ 4} Andrew S. was born in February 2005. It is not disputed that Anthony S. is the father of Andrew and Emily S. In July 2005, LCCS received a referral including an allegation of unstable housing and concerns regarding appellant's parenting skills. Appellee investigated the matter and opened a case. The agency assigned a caseworker, a community advocate and a housing specialist to work with appellant, who at that time was living with Andrew at the Beach House, a local shelter. Appellant was referred to various sources for parent education and interactive parenting classes, as well as day care so that she could participate in her case plan services and attend appointments. A referral was made for mental health services and a housing specialist worked with appellant to obtain a Section 8 certificate for subsidized housing. Details of those efforts on the part of LCCS will be set forth below.
 {¶ 5} In October 2005, the agency received referrals regarding possible physical abuse of Andrew and allegations that appellant was not properly supervising her son. At that time, they were living at Bethany House, another local shelter. As a result of the additional concerns that had arisen since the case was opened, on October 28, 2005, the agency filed a complaint in dependency and neglect. An emergency shelter care hearing was held that day and interim temporary custody of Andrew was awarded to LCCS. At a *Page 3 
mediation held on December 8, 2005, appellant agreed to a finding of dependency and to a grant of temporary custody to LCCS. Father was not present, but several days later agreed to the finding of dependency. Andrew was adjudicated a dependent child and placed in a relative's home.
 {¶ 6} Appellant gave birth to Emily in March 2006, and several days later the agency filed a complaint in dependency as to her. Emergency custody of Emily was awarded to LCCS. On May 24, 2006, the parents consented to a finding of dependency as to Emily and the trial court awarded temporary custody to the agency. Emily was placed in relative care with her brother. Case plan services continued to be provided in an attempt to reunify the family.
 {¶ 7} On September 19, 2006, LCCS filed a motion for permanent custody of both children. The matter was set for a permanent custody hearing on January 17, 2007. On that date, Anthony S., father of both children, stipulated as to the allegations in the motions for permanent custody of both children as they related to him. The trial court found father's stipulation to be made knowingly and voluntarily and with full understanding of the consequences of his actions. Father then executed the "Agreement for Permanent Custody" form, which was marked as an exhibit and entered into evidence. Father has not filed an appeal.
 {¶ 8} At the permanent custody hearing, the trial court heard testimony from eight witnesses. Kelly Crampton, appellant's first LCCS caseworker, testified that she became involved when the case was opened in September 2005, so that the agency could provide services to help appellant improve her parenting skills and establish stable *Page 4 
housing. In addition, a community advocate began to work with appellant to link her with various services and ensure that any needed assessments were completed. Appellant was referred to an interactive parenting class through St. Vincent Mercy Medical Center. Crampton also arranged for assistance from Help Me Grow, which works with parents who have children under the age of three. A housing specialist also was assigned to work with appellant and the housing authorities to locate an apartment. The agency also arranged for day care so that appellant could attend her services and go to doctor's appointments after she learned that she was pregnant with Emily.
 {¶ 9} Crampton testified that the agency attempted to find a suitable community shelter but appellant was reluctant to go anyplace where she was not permitted to have contact with father. Crampton learned that father was appellant's payee for her Supplemental Security Income benefits and that the money, approximately $635 each month, was being used to pay expenses at father's apartment and for repairs on his car. She was told that father kept the money and gave appellant $20 from each check. Crampton talked to appellant about arranging to be her own payee, but appellant resisted. Appellant finally moved into Bethany House although she did not want to stay there due to the rules prohibiting contact with father. When appellant continued to see father, Bethany House requested that she leave. LCCS arranged for appellant to live with her mother, despite the agency's concerns about maternal grandmother's "delays" and lack of income. However, that plan fell apart within hours when mother demanded that appellant pay her $300 monthly rent. Bethany House agreed to take appellant back. *Page 5 
 {¶ 10} While at Bethany House, appellant began to see a counselor at Unison, attend parenting classes and have weekly visits from the Help Me Grow worker. By October 2005, however, concerns mounted at LCCS due to referrals regarding appellant's parenting of Andrew. Crampton requested a case conference to discuss possible removal but the agency decided not to make a change at that time and to reconsider in two weeks. By the time of the second conference, appellant's parent educator expressed significant concerns regarding inadequate supervision and appellant's inability to comfort the baby or respond to his hunger cues. Thereafter, the agency requested temporary custody of Andrew and he was placed with a paternal uncle and aunt. Appellant and father were allowed weekly supervised visitation.
 {¶ 11} Crampton further testified that the agency continued working to find appellant subsidized housing and by November had arranged for an apartment and furnishings. After Andrew was removed, appellant stopped going to parenting classes and missed five out of seven consecutive Help Me Grow appointments. Appellant also canceled some of her sessions with the counselor at Unison, keeping only one between January and March 2006. Appellant told Crampton the weekly Help Me Grow sessions were unnecessary and said she wanted to reduce them to once a month; the agency refused to approve a change until appellant showed she could make progress with the weekly sessions. Appellant continually arrived late at her interactive parenting class, which interfered with arrangements for the caregiver to drop Andrew off for the session. On more than one occasion, appellant questioned why her son had to be there at all. Crampton believed appellant did not understand that having her son with her at the *Page 6 
parenting class gave her another opportunity to visit with him each week. At appellant's request, Crampton then arranged with the relatives who had custody of Andrew for appellant to visit her son in their home. However, after arrangements were made for the extra visitation time, appellant decided she did not want to go.
 {¶ 12} Appellant finally moved into her own apartment in November 2005, but by January or February Crampton had begun receiving information that appellant was again living with father. Crampton discussed with appellant the importance of keeping her housing subsidy but eventually, when the housing authorities learned that appellant was living with father, she lost the subsidy. At the end of March 2006, the day before Emily was born, appellant told Crampton that father was being verbally abusive and had on one occasion shoved her during an argument. Appellant was $1,000 behind in her rent due to losing her subsidy and said father told her she could not live with him if she lost her apartment. When Crampton talked to appellant about going to a shelter, she said she did not want to do that and would go back to father's apartment.
 {¶ 13} Catherine Samples, a service coordinator with Harbor Behavioral Health Care ("Harbor"), testified that beginning in August 2005, she worked with appellant weekly in the Help Me Grow program, which focuses on child development and basic parenting skills. Samples was told that appellant needed help with issues such as when to feed the baby, naps and diapering. On one occasion, it took appellant 30 minutes to change Andrew's diaper. She also was concerned about Andrew possibly having developmental delays when, at the age of six months, Andrew was still unable to hold his head up, crawl or sit. Samples thought those delays might be attributed to appellant's *Page 7 
keeping Andrew in his car seat for hours at a time. She initially worked with appellant on her interaction skills with the baby, the importance of bonding and having appropriate expectations for the baby's behavior. Samples also attended appellant's weekly visitations to monitor appellant's interaction with Andrew and make sure his basic needs were met. During the first few months, appellant's ability to interact with Andrew was inconsistent. After Emily was born, appellant had difficulty interacting with both children. Despite discussions about the importance of interacting with both children and providing for the needs of each one during visitation, appellant's behavior continued to be inconsistent. Samples testified that mother is open to her suggestions and shows an ability to remedy problems briefly, but has a pattern of reverting back to the problem behaviors. Samples testified that when Andrew was evaluated several months after being placed in the relative's home, he showed dramatic improvement.
 {¶ 14} At the time of the hearing, Samples had met with mother 96 times. She indicated she would continue to work with appellant on having appropriate expectations, talking to the children rather than yelling, the importance of bonding with both children, the need for routine, and providing appropriate supervision. She further testified that she did not think appellant was ready to care for the children by herself full-time.
 {¶ 15} Amy Tyson took over as appellant's LCCS caseworker in March 2006, one day before Emily was born. The first time Tyson met with appellant, the mother was hysterical because she had lost her Section 8 housing voucher. This was because she was living with father and not in the apartment provided for her. Appellant was receiving approximately $685 each month for SSI but the rent was $500 without the subsidy. At *Page 8 
that time, father told appellant she could not stay with him if she lost her housing. Appellant was already several months behind in her rent but said she would keep it and look for something else eventually. Appellant told Tyson that she did not like to stay in her apartment because she was afraid of the funeral home next door. At the time of the hearing, appellant had different housing which her attorney had helped her locate. Tyson was aware that appellant did not like to stay there, however, because she did not feel safe. Tyson testified that appellant appears to have a difficult time being alone.
 {¶ 16} Tyson testified that in June 2006, she received a report from appellant's mental health therapist at Unison stating that appellant was missing appointments. The therapist reported that rather than discharge appellant, she was going to give her a "break from therapy." The therapist stated that appellant was not internalizing any of the information from therapy, was not utilizing any new or appropriate coping skills and was not making any changes to her behavior. When Tyson discussed the report with appellant, mother stated that she wanted to see a new therapist. Thereafter, appellant's case with Unison was closed due to lack of progress. Appellant then began going to Harbor for services, where she was continuing to receive assistance at the time of the hearing. Tyson testified that appellant was on medication for a form of depression but was inconsistent about taking it. When Tyson explained that it had to be taken every day, appellant said she would work on that.
 {¶ 17} In October 2006, hoping to be able to move appellant to unsupervised visits at the agency, Tyson sat in on a visitation to check on appellant's progress. She testified that appellant appeared to be "very overwhelmed" trying to care for both children, out of *Page 9 
breath, and "sweating a lot." Appellant left Emily in her walker the entire time except for when she changed her diaper. Tyson's biggest concern at that visit was that it took appellant 20 minutes to change the two diapers unassisted and eventually needed Tyson's help watching Andrew while she took care of Emily. The caseworker was also concerned when, during one of her first unsupervised visits, appellant smacked Andrew on the hand hard enough to leave a mark after she had told appellant that all types of physical discipline are prohibited at visitations. The agency also continued to have concerns about appellant's lack of supervision of the children. Tyson stated that during the typical visitation, appellant sits on the couch while Andrew runs around the room and Emily sits in her car seat. She was concerned that appellant yells at Andrew from her seat on the couch when he misbehaves rather than going to him and addressing the child's behavior with him. She testified further that during one visit, Andrew fell and had to be taken to the emergency room for a cut lip. Appellant and father did not react when Andrew fell and started to bleed; an agency staff member had to step in and take care of the child.
 {¶ 18} Tyson testified that the children were adjusting very well in their placement and that they were developmentally on target. She described very positive interaction in the home between the children and their aunt and uncle, who would like to adopt them. Tyson stated that she believed an award of permanent custody to LCCS would be in the children's best interest. Her concerns remain inconsistent housing; appellant's continuing and erratic relationship with father, who wanted to relinquish his parental rights; financial issues and parenting skills. Tyson acknowledged that appellant is making some positive *Page 10 
changes for herself but was concerned that the agency had been working very closely with mother on parenting for almost two years without much progress in her ability to care for the children on her own.
 {¶ 19} Jean Brandt testified that she taught the interactive parenting classes which appellant attended with Andrew and Emily. Beginning in October 2005, appellant and father attended the initial 24-week session with Andrew. After Emily was born in March 2006, Brandt asked for an extension so that she could see how the parents would function with two children in their environment. Appellant and father attended for another 10 to 12 weeks and Brandt again asked them to attend additional classes. At that point, father dropped out but appellant continued to attend. Brandt recommended that appellant continue attending the classes after completing the program because she believed appellant was still in need of services and wanted to observe appellant as the sole caregiver for both children.
 {¶ 20} Brandt's main concern was appellant's inconsistency in following through with situations that arose with the children. She testified that appellant rarely appears comfortable with the children and has not been responding to suggestions made by the facilitators. The facilitators worked closely with appellant because she had trouble reading and understanding written work; when it was time for the final test, they allowed appellant to answer the questions aloud rather than write them down. After 50 weeks of classes, appellant continued to raise her voice with Andrew, then not quite two years old, and yell louder and louder in an attempt to get his attention from across the room. Brandt testified that Andrew was not as open with appellant and willing to go to her as he had *Page 11 
been six months earlier and that their bonding was not as good as it once was. Brandt testified that mother was still attending the classes at the time of the hearing in January 2007. In a letter dated November 10, 2006, and submitted to the court, Brandt stated that she and the other facilitators of the class could not recommend that the children be returned to appellant without in-home support. Brandt testified that her opinion had not changed since writing the letter. She did not know whether appellant would ever be able to handle both children.
 {¶ 21} Several witnesses testified on appellant's behalf. Shelly Householder, who works in the intake department at the Lucas County Board of Developmental Disabilities, testified that she met with appellant at the request of LCCS in September 2006, to determine appellant's eligibility for services. After reviewing appellant's documentation, which included psychiatric and psychological evaluations as well as school records, Householder determined appellant was not eligible because she does not have mental retardation or any other qualifying diagnosis according to the standards set by the state of Ohio. Householder stated that appellant has "mental health issues" and her intellectual functioning level is in the borderline range between mental retardation and average.
 {¶ 22} Jill Craft, a social worker at Harbor, testified that she had managed appellant's case for Harbor since August 2006. Craft was meeting with appellant on a weekly basis for group therapy and two to three times a month individually. She testified that appellant participated in therapy groups covering such topics as self-esteem, daily coping skills, anger management and women's issues. Appellant also received some individual counseling sessions and was put on medication, which Harbor monitored. *Page 12 
Appellant completed anger management and domestic violence courses but Craft did not have personal knowledge of appellant's performance in those classes. Craft believed appellant and father had separated in August 2006, although appellant still had father as the payee for her social security benefits. Craft testified she was working with appellant to arrange to become her own payee. She anticipated that might happen within the next few months as long as appellant was found by Social Security to meet the necessary requirements for being her own payee.
 {¶ 23} Craft testified that appellant had been diagnosed with dysthemic disorder, which is a form of depression, and borderline intellectual functioning. There were occasions when Craft had to repeatedly tell appellant something; at those times appellant would become angry and frustrated. Appellant told Craft that there were things discussed in parenting class that she did not understand and that after a visiting with her children at the agency for an hour or two she would feel overwhelmed. Craft stated that appellant had made a little progress in her group counseling but did seem overwhelmed at times. Craft testified that she could not make a recommendation regarding whether the children should be placed with their mother because she had not had the opportunity to observe appellant and the children together.
 {¶ 24} Appellant's mother testified that she lived with her daughter and Andrew for the first eight months after Andrew was born in order to help appellant care for the baby. She believes appellant is a good mother and said she has no concerns about the safety of the children when they are with their mother. *Page 13 
 {¶ 25} Appellant testified on her own behalf. She expressed her understanding that the children were removed from her custody because the agency had concerns about her parenting skills and her abusive relationship with their father. She also testified that the agency did not think she could handle both children without help. She believed her mother and cousins could help her care for the children if they were returned to her custody. Appellant testified that she hoped the court would give her more time to learn how to be consistent with the children, which she thought she was doing before she "backed off several months before the hearing and was told she was "not doing so well." Appellant further testified that she thought it would help if she could go to more parenting classes. At the time of trial, appellant still had father designated as the payee for her social security benefits. She stated that he cashes the check and gives the money to her.
 {¶ 26} At the conclusion of the testimony, the children's guardian ad litem recommended that the agency be awarded permanent custody. On February 15, 2007, the trial court found pursuant to R.C.2151.414(B)(1)(a) that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent and that, pursuant to R.C. 2151.414(D), an award of permanent custody to Lucas County Children Services is in the children's best interest. Accordingly, the trial court terminated mother's and father's parental rights and awarded permanent custody of Andrew and Emily to Lucas County Children Services.
 {¶ 27} In her sole assignment of error, appellant asserts that the trial court's decision was not supported by clear and convincing evidence. Appellant argues that *Page 14 
LCCS failed to make reasonable efforts to help appellant remedy the conditions that prompted the children's removal. She asserts that she substantially remedied those conditions by attending parenting classes, separating herself from father, obtaining independent housing and applying to be her own payee for her social security checks. Appellant's arguments are not supported by the evidence presented to the trial court.
 {¶ 28} In granting a motion for permanent custody, the trial court must find that one or more of the conditions listed in R.C. 2151.414(E) exist as to each of the child's parents. If, after considering all relevant evidence, the court determines by clear and convincing evidence that one or more of the conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C.2151.414(B)(1). Further, pursuant to R.C. 2151.414(D), a juvenile court must consider the best interest of the child by examining factors relevant to the case including, but not limited to, those set forth in paragraphs (1)-(5) of subsection (D). Only if these findings are supported by clear and convincing evidence can a juvenile court terminate the rights of a natural parent and award permanent custody of a child to a children services agency. In re William S. (1996),75 Ohio St.3d 95. Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 29} This court has thoroughly reviewed the record of proceedings in this case, from appellant's first involvement with LCCS in July 2005, through the hearing on the *Page 15 
motion for permanent custody and the trial court's decision. The trial court's decision in this case is extremely thorough and addresses all of the relevant statutory factors in detail.
 {¶ 30} The trial court found that LCCS made reasonable efforts to prevent the continued removal of the children from their home by providing case plan services to both parents. Those services included referrals to two types of parenting classes; a community advocate to assist with making appointments and other daily living tasks; a housing specialist to help appellant obtain a housing subsidy and a suitable apartment; mental health treatment, and regular visitation with the children. The trial court found that the service providers recognized that appellant was a slow learner and therefore extended the period of time in which parenting instruction was offered far beyond the typical class length. Arrangements also were made for appellant's parenting assignments to be performed orally so that she did not have to read and write, and for individualized parenting instruction.
 {¶ 31} Pursuant to R.C. 2151.414(E)(1), the trial court further found that, notwithstanding reasonable case plan services and diligent efforts by the agency, the conditions which caused the removal of the children have not been remedied. The court noted that after 96 visits with appellant, the Help Me Grow caseworker continued to have concerns regarding appellant's ability to supervise and care for the children and stated at trial that she could not recommend that the children be returned to their mother's care. The court further noted that the interactive parenting coach, after 50 weeks of working with appellant, found appellant's progress inconsistent and could not recommend reunification. *Page 16 
 {¶ 32} Additionally, the trial court found, pursuant to R.C.2151.414(E)(4), that each of the parents demonstrated a lack of commitment to their children. As to appellant, the trial court noted testimony that she was late to visitations and parenting classes, even after special accommodations were made; that she did not follow through with her mental health services at Unison and was terminated from the program in June 2006; that, even after LCCS provided considerable assistance to appellant to find safe and secure housing, appellant did not reside there; and that, despite repeated encouragement from her caseworkers, appellant resisted taking the necessary steps to become her own SSI payee, which resulted in the process not being complete at the time of the permanent custody hearing.
 {¶ 33} Finally, in considering the best interest of the children pursuant to R.C. 2151.414(D), the trial court found that Andrew had demonstrated tremendous improvement in his developmental abilities immediately upon removal from the home. The trial court noted that several witnesses had expressed concerns that appellant is not appropriate in her demeanor toward Andrew and that her behavior had a negative effect on the child. The trial court also noted that the children's needs are being met and that they have bonded with each another and with the other family members. The trial court found that Andrew and Emily are in need of a permanent plan and that the only means of meeting that need is an award of permanent custody to LCCS so that an adoptive placement can be facilitated.
 {¶ 34} Based on our review of the record, we find that the trial court's decision was supported by clear and convincing evidence that an award of permanent custody to *Page 17 
the Lucas County Children Services was in the children's best interest. Accordingly, appellant's sole assignment of error is not well-taken.
 {¶ 35} On consideration whereof, this court finds that substantial justice was done the party complaining and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the cost of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski P.J., Thomas J. Osowik, J. concur. *Page 1